**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|

JEAN N. NOEL,

     **Plaintiff,**

**v.**                                                              **Case No.: PWG-13-1138**

UNITED PARCEL SERVICE, INC,

     **Defendant.**

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION[1]**

     Plaintiff, a black man of Haitian ethnicity, brings this claim against his employer for discrimination, retaliation, and hostile work environment under 42 U.S.C. § 1981, alleging that he was subjected to a pattern of insulting and offensive language at the hands of his supervisors that culminated in his termination for false accusations of misconduct.  Defendant employer has moved for summary judgment on all counts, arguing that Plaintiff's termination neither was discriminatory nor retaliatory, but was based upon the legitimate, good faith belief that he had engaged in misconduct.  Defendant also argues that it properly responded to Plaintiff's claims of on-the-job harassment and adequately guarded against such conduct, and therefore cannot be liable for Plaintiff's hostile work environment claim.   Because I find that Plaintiff was terminated based on the legitimate and nondiscriminatory belief that he engaged in misconduct, I grant Defendant's motion with respect to the discrimination and retaliation counts.  But because

---

[1] This Memorandum Opinion disposes of Defendant United Parcel Service, Inc.'s Motion for Summary Judgment ("Def.'s Mot."), ECF No. 23, and supporting Memorandum ("Def.'s Mem."), ECF No. 23-1, as well as Plaintiff Jean Noel's Opposition ("Pl.'s Mem."), ECF No. 26 and UPS's Reply ("Def.'s Reply"), ECF No. 28.

a reasonable jury could find that Defendant did not take adequate steps to prevent or respond to Plaintiff's complaint of a hostile work environment, I deny summary judgment on that count.

## I.   BACKGROUND

In reviewing a motion for summary judgment, the Court considers the facts in the light most favorable to the non-movant, drawing all justifiable inferences in that party's favor. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (U.S. 2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004).   Unless otherwise stated, this background is composed of undisputed facts.   Where a dispute exists, I consider the facts in the light most favorable to Plaintiff.   *See Ricci*, 557 U.S. at 585–86; *George & Co.*, 575 F.3d at 391–92; *Dean*, 336 F. Supp. 2d at 480.

Defendant United Parcel Service, Inc. ("UPS") is a Delaware corporation with its primary place of business in Georgia, Compl. ¶ 4, ECF No. 1; Answer ¶ 4, ECF No. 4.   UPS describes itself as "the world's largest package delivery company and a leading global provider of specialized transportation and logistics services."   *About UPS*, UPS, http://www.ups.com/content/us/en/about/index.html (last visited Aug. 29, 2014).   Plaintiff Jean Noel is a black male of Haitian background.   *See* Compl. ¶ 3; Def.'s Mem. 3.   Noel worked for UPS at its Burtonsville, Maryland facility beginning in 1998 until his resignation in 2011, Pl.'s Resps. to Def.'s First Set of Discovery Requests ("Pl.'s Interrog. Resps.") 8–9, Pl.'s Opp'n Ex. A, ECF No. 26-1, beginning as a part-time Sorter and, after several raises, eventually working as a full-time, "combo" employee performing the jobs of an "Irregs Sorter" and an Air Driver.   *Id.*; Noel

Dep. 99:20 – 104:4, Pl.'s Mem. Ex. 2, ECF No. 23-3.[2]   Noel was a member of, and represented by, the International Brotherhood of Teamsters and his employment was governed by a Collective Bargaining Agreement ("CBA").   *Id.* at 105:6–14.

As a combo employee, Noel had several supervisors.   At the times relevant to his Complaint, Noel was supervised by John Zaner, Jeremy Rodriguez, and others in his role as an Air Driver, *id.* at 115:19 – 116:18, and he was supervised by Lisa Brock in his role as a Sorter, *id.* at 116:19:22.   Noel testified that he was subjected to a pattern of race- and national-origin-based abuse from both Rodriguez and Zaner.   According to Noel, they "call[ed] me Haitian boy, mimick[ed] my accent, mock[ed] me and call[ed] me Muhammad and ask[ed] me that, you know, do we have cars in Haiti or do you just ride elephants, do you have McDonald's in Haiti or do you just eat whatever you can find," and similar questions about Haiti.   *Id.* at 225:20 – 226:4.   Rodriguez acknowledges that he called Noel "The Haitian Sensation," Rodriguez Dep. 34:13–16, Pl.'s Opp'n Ex. F, ECF No. 26-6, but claims that Noel never objected to that, *id.* at 34:19–25, and did not recall having ever made any other comments about his background, *id.* at 35:2–14.   Noel also testified that Zaner frequently threatened to fire him, Noel Dep. 232:8–14, called him "Haitian," and gave him more onerous work, telling him "I thought you guys worked like that back in your country," *id.* at 276:15 – 279:1.   In addition, Zaner frequently would speak to Noel in a mock Jamaican accent and, when Noel said he was Haitian and not Jamaican, responded that "They're the same thing."   Pl.'s Interrog Resps. 4.   Noel complained to some co-workers and to Lisa Brock, as well as telling the human resources department ("HR") that he was

---

[2]   According to the record, a "combo employee is a specific type of employee under the Collective Bargaining Agreement where they take two part-time jobs and combine them together to make a full-time job."   Noel Dep. 103:21 – 104:4.

being mistreated, but he did not tell HR that he believed he was being discriminated against on the basis of race, ethnicity, or national origin.  *Id.* at 232:5 – 233:13.

On one particularly hot day in August 2011, Noel wrapped a towel around his head to keep him from sweating on packages while he worked.  *Id.* at 269:14–19.  Zaner called Noel "Muhammad" and threatened to fire him if he did not remove the towel from his head.  Pl.'s Interrog. Resps. 3.  Noel filed a grievance with his union, *id.*, and, at Brock's urging, reported the incident to HR, Noel Dep. 283:16 – 284:12.  Noel discussed the incident with Wendy Russell in the HR department, who spoke with Zaner's boss; Zaner's boss indicated that he would meet with Zaner about the incident and get him to apologize to Noel.  *Id.* 284:13 – 286:2.  Zaner did not apologize to Noel, but Noel noted that he was "trying to be nice all of a sudden" for one day, although Noel thought Zaner actually was mocking him and "the harassment didn't stop," as Zaner continued to call him "boy" and to engage in similarly offensive conduct.  *Id.* at 286:14 – 287:19.  Noel reported the continued conduct to his shop steward, but did not report it to Russell or anyone else in HR.  *Id.* at 287:20 – 288:4.

On December 3, 2011, Noel was working at the Burtonsville facility and observed two bottles of juice on a table in UPS's damaged goods processing area, which is where damaged packages are placed to be repackaged but, according to Noel, also is an area that also is used by employees.  *See id.* at 126:4–22; Pl.'s Interrog. Resps. 7.  According to Noel, the bottles were not wrapped or in any packaging, and he took them and moved them to Brock's office so that nobody would take them.  Noel Dep. 142:2 – 20.  He did not immediately tell anybody that he had put the bottles there, *id.* at 150:5–15, but eventually he did report the incident to Brock by telephone, *id.* at 155:5–19, although Noel could not remember any details of doing so, *id.* at

157:1–21, and Brock denies any such communication occurred, Brock Aff ¶ 8, Def.'s Mem. Ex. 7, ECF No. 23-8.

On December 10, 2011, Noel's shop steward called him into a meeting with Crystal Rogers and several other people.  *Id.* at 191:8 – 192:8.  Rogers, an African–American woman, *id.* at 119:9–12, was a Security Supervisor for UPS at that time and never had met Noel.  Rogers Aff. ¶ 2, Def.'s Mem. Ex. 1, ECF No. 23-2.  Rogers accused Noel of stealing the bottles of juice that he had moved on December 3, and did not believe Noel's claim that the bottles had not been in a package or that he had moved them to Brock's office.  Pl.'s Interrog. Resps. 7.  Rogers did not contact Brock to confirm his story.  *Id.*

According to Rogers, the bottles had gone missing from a damaged package that had been placed to the damaged goods area.  Rogers Aff. ¶¶ 9–11.  Because of concerns about theft, the damaged goods area is under video surveillance and Rogers, viewing the video, saw a black male in a UPS uniform and a hoodie removing items from what appeared to be the package of juice bottles.  *Id.* ¶¶ 11–12.[3]  Although she could not identify the person removing the juice from the video, a surveillance video of the guard shack at the entrance to the Burtonsville facility appeared to contain video of the same person on the same day.  *Id.* ¶ 13.  Rogers asked Rodriguez for help identifying the person in the video, and Rodriguez identified Noel.  *Id.* at ¶ 14.  In an attempt to corroborate her suspicions of Noel, Rogers staged a "salt" operation, in which bottles of Gatorade were left unattended in the damaged goods area; Noel did not take any

---

[3] Noel objects that it is "highly suspicious" that the video of the damaged goods processing area has "mysteriously disappeared."  Pl.'s Opp'n 20.  Although the missing video raises potential evidentiary issues under Fed. R. Evid. 1002, Noel has not suggested that UPS has engaged in spoliation and there is nothing in the record as to why the video is not available, which leaves open the possibility that secondary evidence of its contents may be admissible under Fed. R. Civ. P. 1004.  In any event, because the only relevant issue, as discussed below, is whether Rogers genuinely believed that Noel had pilfered the juice bottles, it is not clear that the video directly is relevant to her state of mind.

of the Gatorade bottles. *Id.* ¶ 16. According to a report of the investigation, at least one other employee was believed to have removed juice bottles from the package at issue. Investigation Detail Report 2, Pl.'s Opp'n Ex. B, ECF No. 26-2.

At the December 10 meeting, Noel was given the option to resign and was informed that, if he did not, he would go to jail and be fired under circumstances that would preclude him from finding work in the future. Noel Dep. 202:15–22. As a result, Noel resigned. *Id.* at 205:5–22. On his Separation form, the reason for his termination was recorded as "Resign Personal Reason." Separation Form, Rogers Aff. Ex. G, ECF no. 23-2.

UPS has several policies that address discriminatory or harassing employee conduct. The UPS Policy Book includes such headings as "We Value Human Rights," "We Place Great Value on Diversity," "We Maintain an Environment Free of Discrimination and Harassment," and "We Provide Employees the Ability to Report Concerns to the Company." UPS Policy Book 24–25, Rogers Aff. Ex. A, ECF No. 23-2. The Policy Book states that "[e]mployees may communicate their concerns by speaking to their direct manager or supervisor, [or] by using the Open Door Policy to talk to someone else in management, including their Human Resources manager." *Id.* at 25. The UPS Code of Business Conduct prohibits discriminatory harassment, UPS Code of Business Conduct 19–20, Rogers Aff. Ex. B, ECF No. 23-2, and UPS has an additional Professional Conduct and Anti-Harassment Policy, Rogers Aff. Ex. C, ECF No. 23-2.

UPS also has an Honesty in Employment policy, which, among other things, states, "We expect honesty from our people in their handling of money, merchandise, and property with which which they are entrusted." Honesty in Employment, Rogers Aff. Ex. E, ECF No. 23-2. Noel had signed this policy. *Id.* Noel also signed a document titled "Tampering with Merchandise," which stated,

> Except for specifically assigned employees and in cases where merchandise has
> spilled on the belt, no employees shall open for any reason, or place his hand into
> any opened or damaged parcels for any reason.  Any such act shall be considered
> tampering with merchandise and will be grounds for termination of employment.

Tampering with Merchandise, Rogers Aff. Ex. F, ECF No. 23-2.

Rogers has averred that the action taken with respect to Noel "was consistent with action that UPS has taken in other cases where it was concluded that an employee had pilfered a package, stolen merchandise, or engaged in similar acts."  Rogers Aff. ¶ 21.  Specifically, Rogers recalled two instances in which white employees were believed to have committed similar misconduct: one was terminated for accepting a package of fruit snacks stolen from a vending machine, one was allowed to resign after an investigation found that he had pilfered pharmaceuticals from a UPS package.  *Id.* ¶¶ 22–23.  Rogers is "not aware of any UPS employee that engaged in the same or similar misconduct as Noel and received more favorable treatment." *Id.* ¶ 25.  Noel counters that he was treated less favorably than employees who had not committed misconduct.  Pl.'s Opp'n 22.

Noel filed a union grievance following his termination, Noel Dep. 302:16 – 303:4, but the grievance was resolved against him following binding arbitration under the CBA, *id.* at 303:5–22.

On April 18, 2013, Noel filed his three-count Complaint in this Court alleging (I) discrimination on the basis of race or ethnicity in violation of 42 U.S.C. § 1981; (II) hostile work environment in violation of 42 U.S.C. § 1981; and (III) retaliation in violation of 42 U.S.C. § 1981.  Compl.  Discovery ended on January 30, 2014, Order, ECF No. 21, and Defendant filed its Motion for Summary Judgment on February 20, 2014, ECF No. 23.  Plaintiff has responded, Pl.'s Opp'n, ECF No. 26, and Defendant replied, ECF No. 28.  The motion now is before me. Having reviewed the filings, I find a hearing is not required.  Loc. R. 105.6.

## II.    STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).   If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317 (1986).   The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).   Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*

In reviewing the evidence related to a motion for summary judgment, the Court considers undisputed facts, as well as the disputed facts viewed in the light most favorable to the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004).

III.     DISCUSSION

     A.   Count I: Racial Discrimination

     UPS has moved for summary judgment with respect to Noel's § 1981 discrimination claim on the grounds that Noel neither has presented a *prima facie* case of discrimination nor has shown that UPS's justification for his termination was a mere pretext. Def.'s Mem. 10–11.

     To survive summary judgment in an action alleging racial or ethnic discrimination in violation of 42 U.S.C. § 1981, a plaintiff must satisfy the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   *See Howard v. Lakeshore Equip. Co.*, 482 F. App'x. 809, 810 (4th Cir. 2012).   To establish a *prima facie* case, Noel must demonstrate: "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) less favorable treatment than similarly situated employees outside the protected class."[4] *Linton v. Johns Hopkins Univ. Applied Physics Lab., LLC*, No. JKB-10-276, 2011 WL 4549177, at *5 (D. Md. Sept. 28, 2011) (citing *White v. BFI Waste Servs.*, 375 F.3d 288, 295 (4th Cir. 2004)).   If Noel can establish a *prima facie* case, the burden of production shifts to UPS to present a legitimate, non-discriminatory reason its actions, after which "the plaintiff then has an opportunity to prove by a preponderance of the evidence that the neutral reasons offered by the employer 'were not its true reasons, but were a pretext for discrimination.'"   *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (quoting *Tex. Dep't of Cmty. Affairs v. Berdine*, 450 U.S. 248, 253 (1981)).   "The final pretext inquiry 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination,' which at all times remains with the plaintiff."   *Id.* (quoting *Burdine*, 450 U.S. at 256) (alteration in original).   Summary judgment in favor of UPS is proper

---

[4] The analysis conducted to establish a *prima facie* case under 42 U.S.C. § 1981 is the same as the analysis a the violation of Title VII.   *Stovall v. Smith*, 962 F. Supp. 692, 694 (D. Md. 1996).

if Noel "fails either to make a *prima facie* case or to rebut the employer's proffered explanation of its actions." *Linton*, 2011 WL 4549177, at *5.

Noel questions the applicability of the *McDonnell Douglas* at the summary judgment stage in light of recent case law "admonishing district courts to '"resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non*."'" *Barrett v. Bio-Medical Applications of Md., Inc.*, No. ELH-11-2835, 2013 WL 1183363, at *14 (D. Md. March 19, 2013) (quoting *Merritt*, 450 F.3d at 295 (alteration in original)); *see* Pl.'s Opp'n 14. Noel also argues that other circuits "have expressly done away with the *prima facie* case analysis for the purposes of summary judgment." Pl.'s Opp'n 14. However, these courts have not adopted a functionally different test, but simply have eschewed rigid adherence to the tennis-match burden-shifting of *McDonnell Douglas* in favor of a more holistic examination of whether a jury could find discrimination. *See, e.g.*, *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). And in any event, the Fourth Circuit expressly has declined to abandon *McDonnell Douglas*, *Pepper v. Precision Valve Corp.*, 526 F. App'x 335, 336 n.* (4th Cir. 2013), and so, even if the Fourth Circuit occasionally may skip the *prima facie* case analysis where it is apparent that an employer had a legitimate, nondiscriminatory justification, *see Mandengue v. ADT Sec. Sys., Inc.*, No. ELH-09-3103, 2012 WL 892621, at *16 (D. Md. March 12, 2012) (citing Fourth Circuit cases), that is not because a plaintiff is relieved from making out a *prima facie* case, but rather because the existence of a *prima facie* case becomes less important when an employee nevertheless is fired for a nondiscriminatory reason.

Indeed, in this case, the plaintiff's *prima facie* case analysis and the defendant's legitimate, nondiscriminatory justification analysis appear closely related. UPS argues that Noel

was not fulfilling its reasonable expectations because he had pilfered juice bottles from a package in violation of the company's "Honesty in Employment" and "Tampering with Merchandise" policies.  Def.'s Mem. 13.  Because Noel denies that he ever took the bottles, he maintains, at considerable length, that he was meeting UPS's legitimate expectations.  Pl.'s Opp'n 15–22.  Second, UPS argues that similarly situated employees were not treated more favorably because white employees who had pilfered also were dismissed and, in fact, Crystal Rogers "is not aware of any UPS employee that engaged in the same or similar misconduct as Noel and received more favorable treatment."  Def.'s Mem. 15.  But based on his claim that he did not pilfer any goods, Noel argues that he "was treated [less] favorably than his colleagues who never committed any dishonest act or violation of UPS policy, and were not terminated." Pl.'s Opp'n 22.[5]

Assuming that Noel has raised a disputed issue of fact as to whether he actually pilfered juice bottles (and thus, whether he actually was meeting his employer's expectations), it still is not clear that he has satisfied the fourth prong of his *prima facie* case.  To do so, Noel must show that he was treated disparately because of his race or ethnic background in comparison to other individuals who are "similar in all relevant respects" to Noel.  *See Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010), and insofar as Noel was accused of pilfering, it seems that he is not similar in all respects to innocent employees not believed to have committed any wrongdoing.  Noel has not identified any individual who was treated differently after similar accusations.  *See Stovall v. Smith*, 962 F. Supp. 692, 694 (D. Md. 1996).  In contrast, Rogers has

---

[5] UPS also has asserted that Noel "voluntarily resigned from employment and therefore cannot establish that he was subjected to an adverse employment action."  Def.'s Mem. 12 n.10.  But insofar as Noel testified that he resigned only because he was threatened with firing and prosecution if he did not resign voluntarily, Noel Dep. 202:15–22, it readily is apparent that a jury could find that he was constructively discharged in any event.

averred that she has investigated two white employees for similar conduct with similar results. In a fact pattern similar to this one, Rogers's investigation of a white employee "which included a review of surveillance footage, . . . concluded that [he] had tampered with UPS customer merchandise by pilfering pharmaceuticals from a UPS package.   [Rogers] made the recommendation that [the employee] be offered the opportunity to resign or be terminated, and [he] elected to resign 'for personal reasons.'"   Rogers Aff. ¶ 23.   In another incident, an employee was terminated after an investigation concluded that he had stolen a single package of fruit snacks that had been stolen from a UPS vending machine.  *Id.* ¶ 22.  This pattern of dealing harshly with suspected incidents of theft and pilfering suggests that similarly situated employees were treated no more favorably than Noel was, and that he has not satisfied his *prima facie* case.

But even had Noel done so—or were I to accept his view that he need not do so—his discrimination claim still would fail the *McDonnell Douglas* burden shifting framework because UPS has advanced a legitimate, nondiscriminatory reason for terminating Noel's employment: its belief that he pilfered the juice bottles.  Def.'s Mem. 13.  On this issue, Noel's insistence that he did nothing wrong is of no consequence to whether UPS's actions were legitimate.  In *Jackson v. MedStar Health*, Judge Bennett of this Court explained:

> "[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'" A Court should not second-guess an employer's appraisal. Rather, the Court's sole concern should be "whether the reason for which the defendant discharged the plaintiff was discriminatory."

No. RDB-12-00077, 2012 WL 2923173, at *2 (D. Md. July 17, 2012) (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279–80 (4th Cir. 2000)) (internal citations omitted).  Therefore, if UPS had a good faith reason to believe that Noel stole the juice bottles, it has demonstrated a legitimate non-discriminatory reason for the adverse actions Noel suffered even if it was

12

incorrect. *Id.* Noel has not demonstrated that Rogers, who made the ultimate decision to terminate him, harbored any animus or did not believe that he had pilfered; he merely disagrees with her findings conclusions. *See Hawkins*, 203 F.3d at 279.

Noel also has not rebutted UPS's justification by showing that it was a mere pretext and that his termination actually was based on discriminatory animus. *See Howard*, 482 F. App'x at 810. A plaintiff may demonstrate that the employer's actions were discriminatory "either directly by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. 248, 256 (1981). Noel argues that Rogers's determination that he stole the juice bottles is invalid because it is based on contested testimony. Pl.'s Opp'n 23–24. But he does not dispute that the alleged pilfering was Rogers's actual reason for firing him or introduce any evidence that her explanation was false. *See Price v. Thompson*, 380 F.3d 209, 214 (4th Cir. 2004). This does not demonstrate pretext sufficiently to survive summary judgment. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208 (4th Cir. 2007) (affirming summary judgment where decisionmaker "honestly believed that [plaintiff] deserved to be discharged for threatening" his supervisor because "ultimately, '[i]t is the perception of the decisionmaker which is relevant.'" (quoting *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998) (alteration in original)).[6] As in *Hawkins* and *Jackson*, it is not for me to decide if UPS

---

[6] Noel also argues that "Rogers was plainly acting as the cat's paw of Plaintiff's supervisor, Mr. Rodriguez" because Rodriguez helped Rogers to identify Noel from the surveillance video footage. Pl.' s Opp'n 36. Under the "cat's paw" doctrine, an employer cannot rely on a lack of animus on the part of a formal decisionmaker where she "acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate" with a discriminatory motivation. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290 (4th Cir. 2004). However, the doctrine does not "allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the

correctly resolved its dispute with Noel, but only to determine if its actions were discriminatory. *See Hawkins*, 203 F.3d at 279–80; *Jackson*, 2012 WL 2923173, at *2. Noel fails to show that UPS's belief that he stole was pretext. Therefore, summary judgment in Defendant's favor is appropriate as to Count I.

### B. Count III: Retaliation

UPS also seeks summary judgment on Noel's retaliation claim. To establish a *prima facie* case for retaliation, Noel must be able to show that "(1) he was engaged in protected activity, (2) the defendant acted adversely against him, and (3) that there was a causal connection between the first two elements." *Banhi v. Papa John's USA, Inc.*, No. RWT-12-665, 2013 WL 3788573, at *7 (D. Md. July 18, 2013); s*ee also Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543 (4th Cir. 2003) (holding that the requirements for proving retaliation under Title VII and § 1981 are the same).

Noel argues that he has adduced sufficient evidence to support a *prima facie* case for retaliation: he reported Zaner's conduct to HR, Noel Dep. 283:16 – 284:12, and was terminated from his employment at UPS approximately four months later, *id.* at 205:5–22. UPS disputes that Noel can establish that he engaged in protected activity, Def.'s Mem. 17, or a causal connection between any activity and his termination, *id.* at 18.

Because protected activity includes activity "in opposition not only to employment actions actually unlawful under [§ 1981] but also employment actions an employee reasonably

---

ultimate decision or because he has played a role . . . in the adverse employment decision." *Id.* Here, Noel has not produced evidence that Rogers's independent investigation actually was controlled by Rodriguez. The only role played by Rodriguez was to help Rogers initially to identify Noel from security footage, and Noel acknowledges that he was correctly identified. Noel Dep. 227:5–15. This falls far short of showing that Rodriguez was the actual decision-maker with respect to Noel's termination such that Rogers merely was acting as his cat's paw.

believes to be unlawful," *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005), it is possible that a reasonable jury could find that Noel engaged in protected activity when he reported that Zaner called him "Muhammad," even though that did not directly relate to Noel's actual race, ethnicity, or national origin.  Even though Noel did not use the exact phrase "racial discrimination," Pl.'s Opp'n 34, the conduct at issue clearly implicates race and ethnicity sufficiently to protect him from retaliatory actions.  And there can be no doubt that Noel's termination constituted adverse employment action.

However, Noel has not established the causation element, which requires him to demonstrate not only a causal connection between his opposition and his termination, but that his opposition was the "but for" cause of that termination.  *Univ. of Tex. Sw. Med. Ctr. v. Nasser*, 133 S. Ct. 2517, 2534 (2013).  Noel has not come forward with any facts that suggest that Rogers even was aware that Noel had reported Zaner's conduct to HR, and so she could have acted on a retaliatory motivation.  Rather than try to do so, Noel falls back on his "cat's paw" argument that Rodriguez was the true decision-maker rather than Rogers.  Def.'s Mem. 35–37.  But for the reasons discussed above, the "cat's paw" doctrine is not applicable to this case, and cannot support a causal connection between Noel's reporting activity and his termination.  Accordingly, Defendant is entitled to summary judgment on Count III for retaliation.

### C.  Count II: Hostile Work Environment

Defendant also seeks summary judgment on Noel's hostile work environment claim.  To prevail on a hostile work environment claim, Noel must show that "[]he was subjected to harassment in h[is] workplace that was: (1) unwelcome; (2) based on race [or color or national origin]; (3) severe or pervasive; and (4) imputable to the employer."  *Linton v. Johns Hopkins Univ. Applied Physics Lab., LLC*, No. JKB-10-276, 2011 WL 4549177, at *11 (D. Md. Sept. 28,

2011); *see also EEOC v. Xerxes Corp.*, 639 F.3d 658, 668–69 (4th Cir. 2011); *Banhi v. Papa John's USA, Inc.*, No. RWT-12-665, 2013 WL 3788573, at *8 (D. Md. July 18, 2013); *Muldrow v. Schmidt Baking Co., Inc.*, No. WDQ–11–0519, 2012 WL 4838500, at *11 (D. Md. Oct. 5, 2012) (requirements are the same whether under Title VII or § 1981).

In bringing his hostile work environment claim, Noel claims that Zaner "threatened to fire me every time[] I c[a]me to work, mocking me and stuff like that."   Noel Dep. 232:8–14. Noel also claims that the comments from Rodriguez and Zaner were so numerous that he could not remember them all, but recalled that Rodriguez and Zaner "call[ed] me Haitian boy, mimick[ed] my accent, mock[ed] me and call[ed] me Muhammad and ask[ed] me that, you know, do we have cars in Haiti or do you just ride elephants, do you have McDonald's in Haiti or do you just eat whatever you can find."   *Id.* at 225:20 – 226:4.[7]   Noel also claims that Rodriguez "adopt[ed] a manner of speech that is stereotypically associated with Jamaicans." Pl.'s Mem. 27, and "[w]hen [Noel] tried to object and informed Mr. Rodriguez that he was Haitian, not Jamaican, Mr. Rodriguez said, 'They're the same thing.'"   *Id.*   Zaner also assigned Noel more difficult work on a consistent basis on the justification that "I thought you guys worked like that back in your country."   Noel Dep. 276:15 – 279:1.

It is apparent that at least some of Zaner's comments were unwelcome and based on race or national origin.   Rodriguez and Zaner's repeated questions about Haiti's level of development and calling Noel "Haitian" clearly were comments based on his national origin, and the use of

---

[7] Defendant argues that it is far from clear that calling Noel "Muhammad" was related to his race or ethnicity, but rather was a comment directed as Muslims, which Noel is not.  *See* Def.'s Mem. 32; *see also Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007) (plaintiff must show that "but for" his race, he would not have been harassed).   Noel does not appear to argue to the contrary, Pl.'s Opp'n 30, but because my decision does not rest on whether that particular comment was related to Noel's race or ethnicity (or on a deliberate insensitivity thereto), I need not resolve that issue here.

"boy" to address a black man has undeniable racial implications.  And although UPS argues that the use of a mocking Jamaican accent is "unrelated to his race or national origin as Noel is from Haiti, not Jamaica," Def.'s Mem. 32, a reasonable jury could conclude that Rodriguez's refusal to differentiate between Haitian and Jamaican in his insults was, itself, an additional insult based upon national origin.  Moreover, Noel has claimed that Zaner's hostility led him to receive less favorable, more onerous work assignments based upon Zaner's view of Haitains.  Noel Dep. 276:15 – 279:1.  In short, Noel has shown that Zaner and Rodriguez engaged in a pattern of unwelcome hostility based upon Noel's race, ethnicity, and national origin.

However, the harassment not only must be racially based, it also must be so severe that "the workplace [was] permeated with 'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)) (internal citations omitted).  To meet this standard, a plaintiff must show both that his work environment is "severe and pervasive enough to create an objectively hostile or abusive work environment," and that he "subjectively perceive[s] the environment to be abusive."  *Id.*  And it is plain that Noel subjectively viewed this pattern as sufficiently abusive that he sought out counseling.  Pl.'s Interrog. Resps. 13.

To determine if conduct is sufficiently severe or pervasive, a court must consider: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000).  "[C]ourts usually only allow hostile work environment claims to

proceed where the discriminatory abuse is near constant, oftentimes of a violent or threatening nature, or has impacted the employee's work performance." *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 777 (D. Md. 2010). *But see Muldrow,* 2012 WL 4838500, at *11 (holding that an isolated incident where the defendant "exploded in a loud embarrassing tone," and repeatedly used the word "nigger," sufficed).

Notwithstanding the "high bar" that a hostile work environment plaintiff must clear, *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008), it is not readily apparent that Rodriguez and Zaner's conduct can be characterized as "simple teasing, offhand comments, and isolated incidents," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The conduct Noel describes was near constant, and though not physically threatening, the constant suggestion that Noel came from an uncivilized place could be viewed as humiliating. Further, to refer repeatedly to a black man as "boy" is a notably severe and humiliating slur that militates in favor of a hostile work environment. *Cf. Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (finding references to women as "'bitches,' 'crazy,' 'white trash,' 'ghetto,' and 'prostitutes,'" combined with "use of racially charged terms like "'honky,' 'cracker,' and 'fucking Mexicans'" reasonably could be found to be sufficiently severe). And Noel has argued that the harassment affected his work performance because he was afraid of being fired and was given more onerous work than other employees.

Crucially, "'the question of whether "harassment was sufficiently severe or pervasive is quintessentially a question of fact."'" *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (quoting *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997)); *see Hoyle v. Freightliner*, 650 F.3d 321, 333 (4th Cir. 2011). Accordingly, a reasonable jury could

find that Noel was subjected to severe and pervasive harassment that altered the conditions of his employment.

The final element is whether this conduct can be imputed to UPS.  UPS relies on its robust anti-harassment policy as "undisputed evidence of UPS's reasonable care," Def.'s Mem. 35, and the Fourth Circuit has held that "dissemination of 'an effective anti-harassment policy provides compelling proof' that an employer has exercised reasonable care to prevent and correct . . . harassment."  *Matvia v. Bald Head Isl. Mgmt., Inc.*, 259 F.3d 261, 268 (4th Cir. 2001).  However, such a policy only insulates an employer if it effectively was enforcing its policy.  *Id.*  And although when Noel reported the "Muhammad" incident to HR there appeared to have been a swift response, Noel Dep. 284:13 – 286:2, Noel also testified that he had reported the continuing pattern of harassment to Brock and others and there does not appear to have been any response at that time, *id.* at 232:5 – 233:13, even though UPS's Policy Book states that concerns may be communicated to employees' "direct manager or supervisor."  Policy Book 25.

Although "[t]he law requires an employer to be reasonable, not clairvoyant or omnipotent," *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999), "[o]nce the employer has notice, then it must respond with remedial action 'reasonably calculated to end the harassment.'"  *Sunbelt Rentals*, 521 F.3d at 319 (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003)).  The evidence shows that Wendy Russel in HR spoke with Zaner's supervisor, who told him to apologize to Noel, but that Zaner never actually apologized, and that "the harassment didn't stop" otherwise.  Noel Dep. 284:13 – 287:19.  Although it is far from clear what level of fault, if any, lies with UPS, a reasonable jury could conclude that, having received notice of racial and ethnic harassment of Noel by his supervisor, UPS's response was deficient and therefore that UPS bears some responsibility for Noel's harassment.

Accordingly, I find that UPS is not entitled to summary judgment with respect to Count II for hostile work environment.

**IV.     CONCLUSION**

For the aforementioned reasons, Defendant's motion for summary judgment is GRANTED with respect to Counts I and III, and otherwise is DENIED.

A telephone conference call SHALL BE SCHEDULED for Tuesday, September 23, 2014 at 9:30 a.m. to set this case in for a jury trial.  Counsel for Plaintiff is to initiate the call.

A separate order shall issue.

Dated: <u>September 9, 2014</u>                                    <u>          /S/                   </u>
                                                                                           Paul W. Grimm
                                                                                           United States District Judge

jml